[No. B174152. Second Dist., Div. Four. Nov. 30, 2004.]

DREAM THEATER, INC., et al., Plaintiffs and Respondents, v.
DREAM THEATER et al., Defendants and Appellants.

COUNSEL

Latham & Watkins, Kristine L. Wilkes, Russell F. Sauer, Jr., and Lauren S. Kim for Defendants and Appellants.

Castle & Associates, Nomi L. Castle, Farzad Tabatabai and Robert S. Blonstein for Plaintiffs and Respondents.

OPINION

**GRIMES, J.**—This is an appeal from an order staying proceedings before the American Arbitration Association (AAA) based on the finding that the parties' commercial dispute is not arbitrable and jurisdiction lies with the court. We hold that (1) the parties' agreement determines whether the court or the arbitrator decides if the dispute is subject to arbitration; (2) where the parties do not offer evidence extrinsic to the contract, on appeal we review the contract independently; and (3) the parties state a clear and unmistakable agreement that the arbitrator will decide whether the dispute is subject to arbitration when they incorporate into their agreement the AAA Commercial Arbitration Rules which specify the arbitrator will decide arbitrability, and nothing in the parties' agreement excludes from the jurisdiction of the arbitrator the decision whether the dispute must be submitted to arbitration.

## FACTUAL BACKGROUND

### *The Contract and the Arbitration Clause*

Appellants are the buyer of an Internet-based multimedia and entertainment business and its managing agents. The buyer is Dream Theater, LLC. Its managing agents are The Dupuis Group, LLC, Donald J. Esters, and Steven Dupuis (Buyers). Respondents are the seller Dream Theater, Inc. and its shareholders Ali Davoudian, Mohammed Davoudian, and Darren Chuckry (Sellers). On October 17, 2001, Buyers executed an asset purchase agreement (the Contract) pursuant to which buyer Dream Theater, LLC acquired assets and liabilities of the Dream Theater business from Sellers. The parties executed various schedules and exhibits to the Contract, including a consulting agreement between buyer Dream Theater, LLC and Ali Davoudian, a former shareholder of seller Dream Theater, Inc. Among the liabilities that Buyers assumed was a credit line of $100,000 from Bank of America to Dream Theater, Inc., guaranteed by its shareholders.

The Contract has comprehensive dispute resolution provisions contained in nine separately numbered paragraphs spanning four pages of single-spaced text. The parties used broad language to express their agreement to avoid litigation as a means of dispute resolution. The Contract identifies the parties' respective obligations to indemnify one another from any and all losses, including losses arising from either party's breach of the Contract as well as those arising from third party claims. It sets forth the means to assert a claim of loss by giving an indemnification notice, provides for the enforcement of an uncontested claim by way of stipulated judgment, establishes a period of time to pursue settlement, and establishes procedures for "mandatory, final and binding arbitration" after the settlement period elapses. The Contract specifies that arbitration will be in accordance with the AAA Commercial Arbitration Rules. These rules provide that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."

### *The Nature and Procedural History of the Parties' Disputes*

Buyers hired Mr. Chuckry, a former officer of seller Dream Theater, Inc. to run the business. Some months after the purchase, Buyers learned that Mr. Chuckry had multiple sclerosis, which they believed to have negatively affected his ability to run the business. Buyers claimed that Sellers knew about Mr. Chuckry's illness and had a duty to disclose it to Buyers before the purchase was consummated, and that Sellers' failure to disclose his disability caused Buyers to suffer losses "approaching $500,000."

Buyers served Sellers with an indemnification notice on February 11, 2003, stating their intent to offset their claimed losses by withholding any further payments on the Bank of America credit line, which had an outstanding balance due of $88,855.16. Buyers made no more payments on the credit line. In due course, Bank of America recovered the balance owing on the credit line from Sellers. On December 16, 2003, Sellers filed this lawsuit in superior court seeking recovery from Buyers of the $88,855.16 and other damages, including payments allegedly due under the consulting agreement.

After Sellers filed this lawsuit, Buyers allegedly discovered another breach of the Contract by Sellers. Buyers claimed to have learned in February 2004 that Sellers' largest customer, FX Networks, had given notice of termination of its contract with Sellers some days before the sale to Buyers; and that Sellers failed to disclose the loss of this customer. Sellers had represented in the Contract with Buyers that FX Networks generated revenues of over $1 million in 2001 (the year the Contract was executed), which was more than five times what Sellers' next largest customers generated that year. On about February 11, 2004, Buyers served Sellers with a second indemnification notice asserting losses of about $1 million as a result of Sellers' failure to disclose the loss of the FX Networks business. Sellers contested this second indemnification notice on February 13, 2004. Buyers demanded arbitration of this dispute on February 23, 2004.

On March 9, 2004, Sellers obtained an ex parte order shortening time for the hearing of Sellers' motion for an order determining the arbitrability of Buyers' claim of damages arising from the alleged failure to disclose the loss of the FX Networks contract. On March 18, 2004, the trial court ordered that the claim was not arbitrable and stayed the arbitration. This timely appeal followed.

## DISCUSSION

### A. *Standard of Review*

█ The issue of who should decide arbitrability turns on what the parties agreed in their contract. (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 943 [131 L.Ed.2d 985, 115 S.Ct. 1920]; *Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 480 [121 Cal.Rptr. 477, 535 P.2d 341].) █ Since the parties here introduced no extrinsic evidence, the trial court's ruling regarding arbitrability is a conclusion of law, and we independently interpret the Contract. (*Merrick v. Writers Guild of America, West, Inc.*

(1982) 130 Cal.App.3d 212, 217 [181 Cal.Rptr. 530]; *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 [99 Cal.Rptr.2d 809].)

## B. *The Arbitrator and Not the court Will Decide What Disputes Are Arbitrable if the Parties Clearly and Unmistakably State That is Their Intent*

In *AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643 [89 L.Ed.2d 648, 106 S.Ct. 1415], the court reaffirmed the basic principles of arbitration. The first two principles guide our conclusion in this case. The first principle is that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' [Citation.]" (*Id.* at p. 648.)     The second principle is that the question of arbitrability is for judicial determination "[u]nless the parties clearly and unmistakably provide otherwise." (*Id.* at p. 649.)

The arbitration clause at issue in *AT&T Technologies v. Communications Workers, supra,* 475 U.S. 643 was part of a collective bargaining agreement. The court reasoned that the presumption of arbitrability furthers the national policy of peaceful resolution of labor disputes and achieves the parties' presumed objectives in collective bargaining. (*Id.* at p. 650.) The court recognized, however, that parties would be less inclined to enter collective bargaining agreements if arbitrators were empowered to decide disputes the parties never agreed to submit to arbitration. (*Id.* at p. 651.) Accordingly, regardless of policy considerations such as those at stake in collective bargaining agreements, the parties' agreement determines what disputes will be arbitrated.

In *First Options of Chicago, Inc. v. Kaplan, supra,* 514 U.S. 938, the court applied the same basic principles of arbitration in a case involving a commercial contract. The court found that "arbitration is simply a matter of contract between the parties." (*Id.* at p. 943.) "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." (*Id.* at p. 944.) The court qualified this principle by finding it should not be assumed the parties intended the arbitrator to decide whether their dispute was arbitrable unless there is clear and unmistakable evidence that they did so. (*Ibid.*) The *First Options* court recognized that the question of who decides whether a dispute is subject to arbitration is "rather arcane," and may not have been considered and agreed upon by the parties. (*Id.* at p. 945.) The court held that, where the agreement is silent or ambiguous on that question, the court and not the arbitrator should decide arbitrability so as not to force unwilling parties to arbitrate a matter they reasonably thought a judge, not an arbitrator, would decide. (*Ibid.*)

California courts often look to federal law when deciding arbitration issues under state law. (See, e.g., *Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 829–835 [5 Cal.Rptr.3d 442].) California law is consistent with federal law on the question of who decides disputes over arbitrability. California courts use the same principles of contract interpretation whether the arbitration clause is in a collective bargaining agreement or a commercial contract. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." (*United Public Employees v. City & County of San Francisco* (1997) 53 Cal.App.4th 1021, 1026 [62 Cal.Rptr.2d 440] [construing a collective bargaining agreement]; accord, *Parker v. Twentieth Century-Fox Film Corp.* (1981) 118 Cal.App.3d 895, 901–904 [173 Cal.Rptr. 639] [parties to a commercial contract did not expressly provide that arbitrator would decide the scope of his authority].) Unless a claim of arbitrability is wholly groundless, the court should stay proceedings pending the arbitrator's determination of his or her own jurisdiction. (*McCarroll v. L. A. County etc. Carpenters* (1957) 49 Cal.2d 45, 65 [315 P.2d 322].) This necessarily requires the courts to examine and, to a limited extent, construe the underlying agreement. (*Freeman v. State Farm Mut. Auto. Ins. Co., supra*, 14 Cal.3d 473.)

C.   *The Parties Here Clearly and Unmistakably Agreed That the Arbitrator Will Decide the Scope of the Arbitration Agreement*

The Contract in issue here does not have a "common broad form" of arbitration agreement.[1] The parties used the term "indemnification" in section 7 of the Contract to define their respective obligations to pay for "any and all claims, losses, damages of any kind, liabilities, obligations, Actions,[2] deficiencies, demands, costs, and expenses (whether or not arising out of third

---

[1] The authors of California Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) paragraphs 5:215.3–5:215.10, at pages 5-121 to 5-123, cite examples of common "broad" versus "narrow" arbitration clauses. An arbitration clause that covers *any claim arising out of or relating to* the contract or the breach thereof "is very broad." (*Larkin v. Williams, Woolley, Cogswell, Nakazawa & Russell* (1999) 76 Cal.App.4th 227, 230 [90 Cal.Rptr.2d 195].) But omission of the phrase *or relating to* has been found to exclude arbitration of some claims. (See *Tracer Research v. Nat. Environ. Services Co.* (9th Cir. 1994) 42 F.3d 1292, 1295.) An arbitration clause that covers *all disputes arising in connection with the agreement* was interpreted broadly in *Simula, Inc. v. Autoliv, Inc.* (9th Cir. 1999) 175 F.3d 716, 720–725. These cases demonstrate how similar language used to describe the scope of an arbitration clause has been interpreted quite differently by the courts.

[2] "Action" is defined elsewhere in the Contract to mean "any action, arbitration, audit, demand, claim, complaint, dispute, hearing, inquiry, investigation, litigation, prosecution or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private)."

party Claims), including, without limitation, all interest, fines, penalties, amounts paid in settlement, costs of mitigation, reasonable attorneys' fees, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing (collectively, 'Losses') . . . ."

The parties' obligations to indemnify complement one another. Sellers agreed to indemnify buyer Dream Theater, LLC against (a) any breach by Sellers of any representations or warranties made in the Contract; (b) any breach of any covenant in the Contract or ancillary documents; and (c) all liabilities except those buyer assumed. Buyer Dream Theater, LLC agreed to indemnify seller Dream Theater, Inc. against (a) any breach by buyer of any representations or warranties made in the Contract; (b) any breach of any covenant in the Contract or ancillary documents; and (c) all liabilities buyer assumed.

The Contract defines the party seeking recovery of losses as the "Indemnified Party" and defines the party against whom losses are sought as the "Indemnitor." The Contract specifies procedures by which an Indemnified Party may obtain a stipulated judgment to enforce an "Uncontested Claim."[3] The Contract also specifies procedures by which an indemnitor may contest a claim, including a period for settlement discussions and, as the last resort, arbitration.

The indemnity provisions are in section 7 of the Contract, and the arbitration clause is also in section 7. It provides initially that, "Each Party agrees that any Contested Claim[4] will be submitted to mandatory, final and binding arbitration in the County of Los Angeles, California, in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect." The arbitration clause addresses various topics, including payment of costs, burden of proof and other matters, and it concludes that "except as specifically otherwise provided in this Agreement, arbitration conducted in accordance with this Agreement will be the sole and exclusive means of resolution of any Contested Claim made pursuant to Section 7."

---

[3] The Contract provides that "[i]n the event that, within thirty (30) calendar days after an Indemnification Notice is received by the Indemnitor, the Indemnitor does not contest such indemnification in writing to the Indemnified Party as provided in Section 7.7(b) (an 'Uncontested Claim'), the Indemnitor will be conclusively deemed to have consented, to the recovery by the Indemnified Party the full amount of Losses specified in the Indemnification Notice in accordance with this Section 7, and, without further notice, to have stipulated to the entry of a final judgment for damages against the Indemnitor for such amount in any court having jurisdiction over the matter where venue is proper."

[4] The Contract provides that a "Contested Claim" arises "[i]n the event that the Indemnitor gives the Indemnified Party written notice contesting all or any portion of an Indemnification Notice."

Sellers contend that the arbitration clause is limited to third party indemnity claims. Sellers' position is plausible, since the term "indemnify" ordinarily relates to third party claims. In support of their argument, however, Sellers rely on cases that construe contracts that are dissimilar to the Contract in issue here. *Varco-Pruden, Inc. v. Hampshire Constr. Co.* (1975) 50 Cal.App.3d 654 [123 Cal.Rptr. 606] (*Varco-Pruden*), involved construction contracts that provided for indemnity of tort claims arising from the contractor's and subcontractor's performance of the work. *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949 [17 Cal.Rptr.2d 242] (*Myers Building*), also involved construction, architectural, and related contracts entirely unlike the Contract here, with provisions that the court found to be standard third party indemnification clauses.

■ Both *Varco-Pruden* and *Myers Building* recognized that "[i]ndemnification agreements ordinarily relate to third party claims." (*Myers Building, supra*, 13 Cal.App.4th at p. 949; *Varco-Pruden, supra*, 50 Cal.App.3d at p. 660.) But this general rule does not apply if the parties to a contract use the term "indemnity" to include direct liability as well as third party liability. "An indemnity agreement is to be interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract." (*Myers Building*, at p. 968.) Here, buyer Dream Theater, LLC agreed to indemnify seller Dream Theater, Inc. against not only third party claims but also any breach of buyer's obligations to seller: for example, buyer must indemnify seller against any breach of the covenant to pay off the Bank of America credit line. To interpret seller's rights under the indemnity agreement to include direct claims against buyer as well as third party claims, but to limit buyer's rights to third party claims, makes no sense in light of the complementary structure of the indemnity clauses. Yet, to accept seller's contention that it is only obligated to indemnify against third party claims would require that the Contract be interpreted to extinguish the parties' reciprocal obligations to indemnify one another against their own wrongdoing.

Sellers do not point to any language of the Contract which specifically limits the arbitration clause to third party claims or otherwise excludes from arbitration the parties' dispute over Sellers' alleged breach of the representations and warranties concerning the FX Networks business. Sellers rely on the venue provisions in both the Contract and in the consulting agreement that was executed at the same time as the Contract as indicating an intent to limit the arbitration clause. The Contract and the concurrently executed

consulting agreement both specify that any action arising out of the agreements may be brought in any state or federal court in Los Angeles having jurisdiction over the dispute, and the parties waive any objection to venue in a Los Angeles court.

These venue provisions do not expressly limit the scope of the arbitration clause, and enforcement of the arbitration clause does not, as Sellers contend, nullify the venue provisions. No matter how broad the arbitration clause, it may be necessary to file an action in court to enforce an arbitration agreement, or to obtain a judgment enforcing an arbitration award, and the parties may need to invoke the jurisdiction of a court to obtain other remedies, such as a preliminary injunction, appointment of a receiver, or a writ of attachment or of possession. (See, e.g., Code Civ. Proc., §§ 1281.2 & 1281.8, subd. (b).)

Sellers also rely on the last of three definitions of "indemnity" in Black's Law Dictionary which on its face is limited to tort liability. Black's Law Dictionary defines "indemnity" as follows: "1. A duty to make good any loss, damage, or liability incurred by another. 2. The right of an injured party to claim reimbursement for its loss, damage, or liability from a person who has such a duty. 3. Reimbursement or compensation for loss, damage, or liability in tort; esp., the right of a party who is secondarily liable to recover form the party who is primarily liable for reimbursement of expenditures paid to a third party for injuries resulting from a violation of a common-law duty." (Blacks Law Dict. (7th ed. 1999) p. 772, col. 2.) Thus, the term "indemnity" encompasses any duty to pay for another's loss or damage and is not limited to reimbursement of third party claims.[5]

The terms "Indemnification," "Indemnified Party," and "Indemnitor" in the Contract, in and of themselves, do not limit the scope of the arbitration clause to third party claims. To the contrary, section 7.1 of the Contract states that Sellers are obligated to indemnify against all losses "whether or not arising out of third party Claims." The Contract here provides for arbitration of all contested claims of loss, and nothing in the indemnity provisions or the arbitration clause is expressly limited to third party lawsuits. Thus, Sellers have not shown that only third party claims of loss are arbitrable. (See

---

[5] Sellers cite Civil Code section 2772, which provides that indemnity "is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." Section 2772 plainly states that indemnity may apply to either direct or third party claims and does not support Sellers' argument.

*Wilshire-Doheny Associates, Ltd. v. Shapiro* (2000) 83 Cal.App.4th 1380, 1396 [100 Cal.Rptr.2d 478].)

It is difficult to imagine how parties could state any more comprehensively than they did in the Contract the intent to avoid litigation at every step of the dispute resolution process. The Contract provides that if a contested claim is not settled within the contractual deadline, then it must be submitted to binding arbitration in accordance with the AAA Commercial Arbitration Rules. These rules specify that the arbitrator will decide disputes over the scope of the arbitration agreement. We conclude that the parties' agreement to arbitrate according to this rule is clear and unmistakable evidence of the intent that the arbitrator will decide whether a Contested Claim is arbitrable.

In *Shaw Group Inc. v. Triplefine Intern. Corp.* (2d Cir. 2003) 322 F.3d 115, the court vacated an injunction prohibiting an arbitration of certain claims. The court found the parties' contract clearly and unmistakably evidenced an intent to arbitrate questions of arbitrability. "Because the arbitration agreement at issue in this case provides for all disputes between the parties to be referred to the International Chamber of Commerce (ICC), and because the rules of that organization expressly provide for the International Court of Arbitration (ICA) to resolve in the first instance any disputes about its own jurisdiction, we conclude that the arbitrability of [the claim] was a question for the arbitrator rather than the court." (*Id.* at p. 118.) We conclude, as the *Shaw* court did, that where the Contract provides for arbitration in conformance with rules that specify the arbitrator will decide the scope of his or her own jurisdiction, the parties' intent is clear and unmistakable, even without a recital in the contract that the arbitrator will decide any dispute over arbitrability.

The parties here dispute what claims are arbitrable and what claims no longer present live controversies. Sellers' complaint concerns Buyers' offset of claimed damages arising from Mr. Chuckry's disability, a claim which Buyers contend Sellers waived by not contesting it pursuant to the dispute resolution provisions of section 7.7 of the Contract. The complaint also asserts claims under the consulting agreement, which does not have an arbitration clause. Buyers' arbitration demand concerns Sellers' alleged failure to disclose the loss of the FX Networks business. On remand, the trial court shall stay this entire action pending the arbitrator's determination of the scope of his or her jurisdiction to decide the various disputes among the parties.

## DISPOSITION

The order staying arbitration is reversed and remanded with instructions to vacate the order finding that AAA has no jurisdiction over the arbitration demand and to enter a new order staying this action pending the arbitrator's determination of the scope of his or her jurisdiction. Buyers are awarded costs on appeal.

Epstein, P. J., and Curry, J., concurred.

A petition for a rehearing was denied December 28, 2004, and the opinion was modified to read as printed above.